## HUSTEDE et al. v. ATLANTIC REFINING CO.

(Circuit Court of Appeals, Third Circuit. June 10, 1896.)

NEGLIGENCE—BURNING OF VESSEL AT OIL WHARF—EVIDENCE—LIBELANTS.

A bark was destroyed by fire while lying at the wharf of defendant oil-refining company in the Schuylkill river at Philadelphia. The fire started with an explosion, which occurred in the works of a gas company, some distance above the wharf, and was communicated to the vessel by floating oil. Libelants charged that the explosion occurred from some oil getting into the gas works by leakage from defendant's buried pipes, which extended along higher ground of the gas works, and that defendants were negligent in respect to laying and maintaining such pipes in good condition. The evidence, however, showed that there was no leakage whereby oil could have gotten into the gas works, and the cause of the explosion was not explained. The presence of oil upon the water was accounted for by the natural leakage in loading oil at various refineries along the river, and the pumping of the same from the holds of vessels. It appeared that this oil was at the time accumulated along the wharves, and in front of the gas works, by a strong wind blowing against that shore. *Held*, that these circumstances showed no negligence or breach of duty by the oil company, rendering it liable for the loss of the bark. 68 Fed. 669, affirmed.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel in personam by Johann Hinrich Hustede and others against the Atlantic Refining Company to recover damages for the loss of their bark Felix by fire while lying at defendant's wharf. The district court dismissed the libel on the merits (68 Fed. 669), and libelants appealed.

Edward F. Pugh and Henry Flanders, for appellants.

John G. Johnson, for appellee.

Before ACHESON, Circuit Judge, and WALES and GREEN, District Judges.

ACHESON, Circuit Judge. The appellants, who were the owners of the bark Felix, filed their libel in admiralty in the court below against the Atlantic Refining Company to recover damages for the loss of the vessel by fire while she lay at the defendant's wharf on the east side of the Schuylkill river, at Point Breeze, Philadelphia. The defendant was the owner of, and was engaged in operating, two oil refineries, on the east bank of the Schuylkill river at the named place,—the upper one being called the "Philadelphia Works," and the lower one the "Atlantic Works." Between the two refineries, and extending along the river for a considerable distance, were the Philadelphia Gas Works. The refineries were connected by iron pipes, through which oil, benzine, and other petroleum products were conveyed from one refinery to the other. These pipes were laid a short distance below the surface of the ground, through the lands of the two refineries and the intervening land of the Philadelphia Gas Works. On October 28, 1892, the bark Felix being in the port of Philadelphia, under charter to the China & Japan Trading Company, Limited, for a voyage to Japan with a cargo of refined oil, was directed by the charterer to accept the

orders of the defendant as to her place of lading, and the bark was ordered by the defendant to its wharf opposite the Atlantic Works, and, under the direction of the deputy harbor master, was made fast thereto. The bark continued in this position, awaiting a cargo to be laden by the defendant, until about 4 o'clock on the morning of October 30, 1892, when a fire took place, which started on shore, upon the premises of the Philadelphia Gas Works, several hundred feet above the vessel, and extended to and enveloped the vessel, whereby, it is alleged, she became a total loss. After reciting these facts, the libel proceeded with the allegations of fact relied on to support the suit. The paragraphs of the libel containing these allegations we think it best here to quote at length, that the issue defined by the pleadings may clearly appear:

"Seventh. At and before the time of the disaster, oil, naphtha, benzine, or similar products were escaping from or through the said pipes, or the joints connecting the same. So large a quantity had escaped in that way that the ground in the neighborhood, and especially that lying between the pipes and the river, became saturated, as did also the wooden pilings and the bulkhead or wharf, and the surface of the river in the neighborhood was covered with the fluid.

"Eighth. The pipes were laid at a distance of about one hundred feet from the water's edge, and about fifty feet above the water, towards which the land slopes. At a point about halfway between the two refineries, and on the water's edge, is the pump house of the Point Breeze Gas Works. This house contains boilers and furnaces. One of the leaks in the pipes was at a point just above this pump house. The escaping fluid, communicating with the fires in the pump house, caused the fire.

"Ninth. Libelants are informed and believe, and so allege, that the pipes, or some of them, had been leaking for a long time prior to the fire, and that considerable quantities of oil, naphtha, benzine, or other like products had escaped, and had run down the incline to the river, and that this state of affairs was well known to the Atlantic Refining Company and its officers, or to some of them.

"Tenth. Libelants are informed and believe, and so aver, that the said pipes were not properly laid, nor were they fitted for the purposes for which they were used, nor were they properly and carefully maintained, nor were the leaks, when discovered, promptly and diligently repaired."

"Thirteenth. The disaster was occasioned by the negligence and default of the Atlantic Refining Company, their officers, agents, and employés, in this: That the said company laid the said pipes, or permitted the same to be laid, carelessly, negligently, and without due regard to the dangerous character of the articles to be conveyed by them, and of the ground through which they passed, and of the surroundings; that the said pipes were so negligently and carelessly constructed that they permitted the escape of large quantities of oil, naphtha, benzine, or other similar dangerous, inflammable, and explosive substances; that the said pipes were laid and maintained upon and beneath the surface of a public street or road, in violation of law, thereby constituting a nuisance; that the said company did not exercise due and proper care to maintain the said pipes in good order and condition; that they did not repair the same as soon as they were found defective; that they did not turn off or stop the flow through the said pipes when they were found to be leaking seriously; that they did not prevent the oil, naphtha, benzine, or similar substance from reaching the fires in the gas works pump house; that the said company, being, in this case, wharfingers, and having invited and ordered the said bark Felix to their wharf, did not maintain their wharf in safe condition, and did not protect the said vessel from damage arising from the dangerous and defective condition of their wharf, as aforesaid; that the said company did not use due and proper care that the said bark should not be burned, injured, or destroyed, or in any way damaged, by fire arising from the condition of their wharf or bulkhead and its surroundings, but so negli-

gently suffered and permitted the said wharf or bulkhead, pilings, pipes, ground, and the surface of river adjacent thereto to be and remain in such bad and dangerous condition, as aforesaid, that the said vessel was damaged as herein stated."

The answer to the libel denied all its averments of negligence, and all the allegations of fact relied on by the libelants to sustain their suit. After a hearing upon full proofs, the court below dismissed the libel.

The gravamen of the libel undoubtedly is that the defendant was guilty of negligence in the particulars therein specified. The appellants, however, contend that, as wharfinger, the defendant is liable for the loss of their vessel by reason of the dangerous condition of the wharf at which she was placed by the order of the defendant, and this whether it was the defendant's oil, or the oil of some other company, or the tar from the gas works, which caused the fire. But, in answer to this proposition, it is enough for us to say that we find in this record no evidence whatever tending to show that the defendant was lacking in its duty as wharfinger unless it was guilty of negligence as charged in the libel. If its pipes were not leaking, and had not leaked, then the defendant had no reason to suppose that the libelants' vessel was exposed to any danger from fire, other than the usual and well-known risks incident to and inseparable from the business in which the vessel was employed by the voluntary act of her owners, and the defendant was under no obligation to give warning to the vessel, or to take any special precautions.

Again, the appellants insist that the defendant is liable, whether shown to have been negligent or not, because bound to prevent an escape of oil from its pipes, and that a failure to do so constituted a nuisance. But whether the defendant owed such a degree of duty to the libelants is a question which does not arise, except upon satisfactory proof of the alleged leakage. And so, without such proof, it is a matter of no moment here whether or not the pipes were laid within the lines of a public road without lawful authority. So that the primary question, and we think the controlling question, is, did the defendant's pipes leak as charged in the libel? To the proofs bearing on that question of fact we now address ourselves.

The location of the defendant's pipes with respect to the river is stated with substantial correctness in the eighth paragraph of the libel. They were laid at a distance of not less than 100 feet from the water's edge, and about 50 feet above the water level, back on the top of the bank. The uncontradicted evidence is that throughout their entire length the pipes were laid in a bed or stratum of clay, there being underneath the pipes 3 or 4 feet of solid clay; and experienced witnesses testified that oil could not penetrate downward through the solid clay, but that, in case of leakage, the escaping fluid would naturally and certainly come to the surface of the ground, through the soil which had been disturbed in laying the pipes. Along the entire rear side of the pump house of the Philadelphia Gas Works, and built against the bank, was a heavy

retaining wall, about four feet thick at the base and battering up to two feet at the top.

It is alleged in the libel that there was a leak in the defendant's pipes just above this pump house, and that the escaping fluid, communicating with the furnace fires in the pump house, caused the fire which did the mischief. Now, it indeed appears that, at that place, on the Tuesday preceding the fire, the defendant discovered a leak which manifested itself by a wet spot on the surface of the ground above the pipes; but the matter was immediately investigated by opening the ground, and, it being found that the escape was from a pipe in which agitator settlings ran, that pipe was at once disconnected, and was not used afterwards. The leak on that occasion was inconsiderable, and it is, we think, clearly shown that it had no connection whatever with the fire of the 30th of October. No one saw any oil in the pump house before the fire. There was no trace of oil on the retaining wall, nor was any mark of oil found on the floor or walls of the pump house, or elsewhere in that building. These facts are inconsistent with the libelants' allegation as to the origin of the fire. It is incredible that the oil could have penetrated the retaining wall or the bank, and gotten into the pump house, without being observed by the engineers and firemen in charge, and without leaving a sign behind.

There was no proof on the part of the libelants to show that the defendant's pipes were not suitable for the purpose for which they were used, or that they were not properly laid, or securely and tightly fitted together at the joints. On the other hand, much credible evidence was produced by the defendant to show that its pipes were suitable, that they were of good material and of approved construction, and that they were properly and carefully laid, screwed together, and maintained, and also that great vigilance was exercised to keep the pipes free from leaks. The libelants produced no direct evidence to show any considerable leakage from the defendant's pipes. The evidence upon which they relied in support of their allegations as to leakage was circumstantial. Thus, it was shown that, for several months before the fire, the engineers and firemen in the pump house of the gas works, and some other persons, had noticed explosions coming from the furnaces in the pump house, and there was testimony that such an explosion occurred simultaneously with the breaking out of the fire. Then witnesses for the libelants testified that, before the fire, more than the usual quantity of oil was upon the surface of the river. Again, several of those witnesses stated that, prior to the fire, they had seen oil in considerable quantities coming out through the cracks in the face of the gas-works wharf, which was in front of the pump house, and also from some places at or near the foot of the river bank. We think, however, that no inference unfavorable to the defendant can fairly be deduced from these circumstances when they are considered in connection with the other proofs.

Until the happening of the fire of October 30th, all the employés at the pump house, and the other persons who noticed the explosions in the furnaces, attributed them to "back drafts" caused by

defective construction and a stack of insufficient height; and it appears to us that the decided preponderance of the evidence is on the side of that hypothesis. Indeed, that these explosions were due to insufficient draft seems to have been demonstrated by obviating changes made in the furnaces and stack since the fire.

It is abundantly proved that for many years there had been more or less oil on the surface of the river at and near Point Breeze. Several other refineries besides those of the defendant, at which vessels take on cargoes of oil, are located and have long been operated on the river bank in that vicinity. It is shown that there are frequent accidental spills of oil in loading vessels, that oil is pumped out of vessels into the river with ballast water and bilge water, and that it often escapes through leaky vessels. This record is full of such evidence to account for the presence of oil on the river. A witness for the libelants,—Charles T. McDonald, one of the engineers in the pump house of the Philadelphia Gas Works,—speaking of this floating oil, stated:

"Sometimes it would be all over the river, and sometimes it would be close in along the wharf, according to which way the wind was blowing. If the wind was from the westward, it would set the oil over on the eastern shore; and if it was from the eastward, it would set the oil over on the western shore."

Now, John C. Tiers, also an engineer at the gas-works pump house, and a witness for the libelants, testifying as to what occurred at the time of the fire, in answer to the question, "Was there more oil on the water towards the eastern or the western bank?" stated: "It was on the eastern bank, because there was a very high wind that morning,—a gale. The northwest wind kept the oil right in along the bank."

The gas-works wharf and the wharf at the Atlantic Works are situated in a cove, and there is much testimony to show that the floating oil is not only driven into this cove by westerly winds, but that it is also brought in by the tide, and that, as the tide rises, the oil is carried up along the face of the gas-works wharf, and the face of the made ground at the foot of the river bank. Speaking of that ground, the witness Tiers testified:

"It is very porous ground there. It is mostly made ground, and there is a great deal of this loose gravel and sand, filled in with clinker and débris, and oil will come through it just like a sponge."

It is by no means an irrational explanation of what the libelants' witnesses observed to suppose that the escaping oil they saw was oil which had gotten through the wharf, and had penetrated the porous made ground at high tide, and came out at low tide. Moreover, it seems to us that the exploration made immediately after the fire, by digging trenches and holes at and near the pump house, tended to exonerate the defendant. No oil was discovered in the long trench which was dug underneath and through the pump house, nor is there satisfactory evidence that any oil was found in the hole dug at the retaining wall. Such oil as was found was obtained in the holes which were dug further down towards the river, and which, on the rising tide, were reached by the water.

Still further, it appears by the clear weight of the evidence that when, shortly after the fire, the pipes were taken up, they were found to be in good order, and no appearance of any considerable leakage was discovered.

The learned district judge was of the opinion that the allegations of fact, upon the truth of which the libelants' right to recover depended, were not sustained, and, upon the most careful consideration of the evidence, we cannot do otherwise than concur in that view. The proofs, we think, fail to establish that there was any considerable or harmful escape of oil from the defendant's pipes or premises. The evidence does not enable us to determine the cause of the fire. Undoubtedly there was other inflammable matter besides oil in proximity to the pump house of the Philadelphia Gas Works. The origin of the fire, however, is a mystery, and it is idle to indulge in conjecture as to the cause. It is enough for us to declare that, in our judgment, the proofs do not justify us in holding that the defendant is responsible either for the breaking out or spread of the fire. We are satisfied that the court below was right in dismissing the libel, and accordingly the decree is affirmed.